THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TAMARA MCCOY,                          )
                                       )
              Plaintiff,               )
                                       )    No. 10 C 2016
         v.                            )
                                       )    Magistrate Judge Arlander Keys
MICHAEL J. ASTRUE,                     )
Commissioner of Social                 )
Security,                              )
                                       )
              Defendant.               )

## MEMORANDUM OPINION AND ORDER

### Procedural History

On November 1, 2006, Plaintiff Tamara McCoy applied for
Social Security Disability Insurance Benefits ("DIB"), alleging a
disability beginning on August 2, 2005. (R. at 139.) Ms.
McCoy's claim was denied on February 22, 2007 (R. at 69.) After
retaining an attorney, on April 16, 2007, Ms. McCoy requested
reconsideration of the denied claim. (R. at 90, 133.) The
Social Security Administration ("SSA") had the claim
independently reviewed by a physician and disability examiner and
determined that the denial was proper under the law. (R. at 94.)
On July 2, 2007, Ms. McCoy requested a hearing before an
Administrative Law Judge ("ALJ"). (R. at 98.)

A hearing was held on January 27, 2009 before ALJ Richard J.
Boyce in Chicago, Illinois. (R. at 22.) The ALJ issued an

unfavorable decision on April 27, 2009, finding that Ms. McCoy was not disabled under sections 216(i) and 223(d) of the Social Security Act. (R. at 80.) Ms. McCoy filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council on May 29, 2009. (R. at 17.) On January 27, 2010, the Appeals Council denied the request for review, making the ALJ's April 27, 2009 decision the final administrative determination of the Commissioner.

On March 31, 2010, Ms. McCoy filed a complaint in the United States District Court for the Northern District of Illinois, seeking review of the Commissioner's determination. The parties consented to proceed before a United States Magistrate Judge, and, on July 6, 2010, the case was re-assigned to this Court. The case is currently before the Court on cross motions for summary judgment.

## Factual Background

### A. *Hearing of January 27, 2009*

At the hearing on January 27, 2009, the ALJ heard testimony from Ms. McCoy, from an impartial medical expert in regards to Ms. McCoy's physical condition, and from an impartial vocational expert in regards to Ms. McCoy's ability to work in today's national economy.

### 1. *Ms. McCoy's Testimony*

Ms. McCoy testified that she was born on March 24, 1960, making her 49 years old at the time of the hearing. (R. at 26.) She testified that she lived in Aurora, Illinois with her daughter, and that she was divorced. (R. at 26-27.) She testified that she had graduated from high school, had attended college for a couple of years, but had not received any kind of degree or Associates Degree. (R. at 27.) When asked about her physical stature, Ms. McCoy indicated that she was 5 feet, 1 inch tall, and that she weighed 180 pounds (R. at 27.)

When asked about her employment history, Ms. McCoy testified that she was working full-time since November 10, 2008. (R. at 28.) She stated that she worked for J.P. Morgan Chase, answering the phone. (R. at 28.) She testified that this was different from her previous job as a branch manager, a position she held for 13 years. (R. at 28.) She explained that, as a branch manager, her duties included opening and closing the branch, performing audits, tilling the drawers, opening and closing accounts, and handling home loans. (R. at 29.) She testified that, in this role, she spent half of her day standing and walking, as opposed to sitting, that she sometimes had to lift more than 25-30 pounds in quarters at a time, and that she supervised 32 people at one point in her career. (R. at 29.)

She explained that she had held other positions, as well, including as an underwriter at a local mortgage company. (R. at 32.) Ms. McCoy testified that she worked on a computer most of the day at her then-present job. (R. at 32.)

When asked about August of 2005, and her illness at that time, Ms. McCoy testified that her blood pressure was extremely high, and that she was constantly in and out of the emergency room. (R. at 44.) She testified that she had contracted to work from home because of her medical conditions, and only had to go into the office once a week. (R. at 45.) She explained that, when she worked from home, she could rest when she got tired. (R. at 45.) She believed that she could not have worked away from home during that time because she was constantly in and out of the hospital and couldn't perform as her supervisors wanted her to. (R. at 45.) She explained that her hospital visits during 2005 mostly concerned her high blood pressure, ulcer, and back pain, adding that the ulcers caused stomach pain and leg cramps. (R. at 45.) She testified that she went to the hospital for seven days and received a blood transfusion. (R. at 45.) She explained that she was treated for deep vein thrombosis in 2001, and that, when she returned to Illinois, her heart problems began, and that she had experienced high blood pressure ever since, in addition to shortness of breath and fatigue due to her

work talking on the phone. (R. at 46.) She stated that at the end of the day, her ankles and feet were swollen. (R. at 46.)

When asked about the cause of her high blood pressure, Ms. McCoy testified that she believed it was the stress involved in her job. (R. at 46.) She explained that people yelled and screamed about their interest rates and her job was to retain these individuals as customers. (R. at 47.) She added that she felt fatigued all day, every day, to the point where she felt like she could not work anymore. (R. at 48.) She also testified that she became weak, and that she cannot lift anything, even her grandchildren. (R. at 48.) She explained that, while she felt fatigue working from home, it was not as intense because she could rest at certain points during the day. (R. at 48.) Ms. McCoy testified that she experienced shortness of breath from everyday activities, such as walking from the door to the garbage can, or from the door to the mailbox. (R. at 49.)

Furthermore, Ms. McCoy testified that she was having problems with sleep apnea, which was making it difficult for her to sleep. (R. at 49.) She also stated that she had back pain that came and went, stemming from a fall she experienced some time ago. (R. at 50.) She explained that the doctors put her on ibuprofen and Celebrex for the pain, which contributed to her weight gain in the past few years. (R. at 51.) She testified

that she lived with her daughter, that she has never smoked, and that she never drinks alcohol. (R. at 53.) She also added that, a year prior to the hearing, she may have been able to work 20 hours a week, but she could work no more than that because she didn't have the strength and energy to do so. (R. at 53.) She testified that, while her current company had put her on medical leave, she didn't want to go on medical leave, and that she did not think she would be able to work at some kind of low-stress job because she needs to have her legs elevated when she sits, which she thought could potentially be just as stressful if she needed to move around. (R. at 54.)

Ms. McCoy testified that she can't lift anything. (R. at 55.) She added that she is a dedicated person, and has worked all her life. (R. at 55.) She explained that she didn't want to claim any disability, but that she feels like there's a piece of lead in her chest that she carries with her every day. (R. at 55.) She added that her whole life has changed in the last two years from everything she used to do, from her job as a bank manager, walking around the bank and taking care of the bank, to sitting in a call center being yelled and screamed at by people who are upset about their credit cards. (R. at 55.) When asked about her current treatment, Ms. McCoy testified that she is on medication and a CPAP machine for her sleep apnea. (R. at 56.)

She added that she also is on medication for her heart, and has undergone several echocardiograms. (R. at 57.)

## 2.  *Testimony of Dr. Bernard Stevens, Medical Expert (ME)*

Medical expert (ME) Dr. Bernard Stevens also testified at the hearing. Dr. Stevens specializes in internal medicine. (R. at 107.)  The ME testified that he had reviewed Ms. McCoy's medical record, which showed that, in 2006, she experienced a dilated idiopathic cardiomyopathy, where she had a very low ejection fraction. (R. at 33.)  The ME testified that Ms. McCoy recovered fairly well from that episode, as her ejection fraction had increased to 45 to 50 percent. (R. at 33.)  Dr. Stevens explained that, while an ejection fraction of 50 percent is the low end of normal and Ms. McCoy still isn't 100 percent, she has recovered most of her systolic function in her left ventricle. (R. at 33.)

Dr. Stevens testified that he does not believe that Ms. McCoy's sleep apnea would affect her residual functional capacity, though he acknowledged that it could affect her ability to stay awake for a job. (R. at 34.)  Dr. Stevens added that Ms. McCoy was fairly stable at the time of the hearing, and that he saw no reason why she couldn't do light work, with some environmental restrictions for working in extreme temperatures, humidity and exposure to atmospheric pollutants. (R. at 34.)  He

also testified that, because there was nothing wrong with Ms. McCoy's joints, there would be no restrictions on her ability to climb ladders or stairs. (R. at 34-35.) Dr. Stevens testified that he saw no evidence of severe leg edema requiring leg elevation. (R. at 35.) He added that the only situation in which an individual with deep venous thrombosis would need to elevate her legs would be if that individual had chronic documented edema as a result of the deep venous thrombosis. (R. at 36.) He testified that this was not the case with Ms. McCoy. (R. at 43.) Additionally, Dr. Stevens testified that none of Ms. McCoy's medications would impact her ability to think. (R. at 40.)

When asked to explain further about Ms. McCoy's back pain, Dr. Stevens testified that there was nothing in the record documenting objective medical findings on the issue; there were no x-rays or anything else to show that her back was a consistent chronic impairment, though he acknowledged that she mentioned it occasionally to her doctors. (R. at 41.)

When asked about whether fatigue would factor into an individual's residual functional capacity, Dr. Stevens testified that it would not for light or sedentary work. (R. at 42.) He acknowledged that Ms. McCoy could have fatigue, but opined that it wouldn't be severe enough to preclude her from working. (R.

at 43.)  He explained that edema needs to persist for 12 months to be a problem, whereas Ms. McCoy's edema only persisted for three weeks.  (R. at 43.)  Dr. Stevens added that the sleep apnea, in and of itself, would have to be very severe in order to have a great impact as an ongoing problem, and that Ms. McCoy's did not appear to be severe.  (R. at 42.)

After hearing Ms. McCoy's testimony, Dr. Stevens testified that the fatigue Ms. McCoy experiences would be caused by her sleep apnea, and that she was probably not responding very well. (R. at 60.)  He added that, if she had such impaired sleep, she might have difficulty with concentrating, and noted that, if she was having trouble concentrating, she would probably not be able to do semiskilled work.  (R. at 60.)  When asked whether Ms. McCoy's problems concentrating could be worse at some times of the day than others, Dr. Stevens testified that it was possible. (R. at 60.)

### 3. *Testimony of Thomas Gusloff, Vocational Expert (VE)*

Next, the ALJ heard from Thomas A. Gusloff, a vocational expert ("VE").  The VE described Ms. McCoy's past employment in great detail.  He explained that her job as a bank manager was listed in the *Dictionary of Occupational Titles* as a sedentary demand position, with a Specific Vocational Preparation (SVP) rating of eight, skilled.  (R. at 61.)  He added that she also

has experience as a mortgage loan processor or loan officer, which he described as sedentary and skilled positions. (R. at 61.) He described Ms. McCoy's last position as more of a credit clerk position, which is a sedentary and semiskilled position, with an SVP rating of four. The VE described the regional economy as the Chicago, Naperville, and Joliet metropolitan areas with 3.8 million jobs, citing the U.S. Bureau of Labor Statistics. (R. at 62.)

The VE was then asked to respond to the following hypothetical in terms of what kind of jobs the hypothetical individual could perform: assume there is a person the same age, education, and work experience as Ms. McCoy, and that person was limited to sedentary, unskilled work. (R. at 62.) The work could not involve any climbing of ladders, ropes, or scaffolds, with no more than occasional climbing of stairs or ramps, stooping, kneeling, crouching, or crawling. (R. at 62.) This individual would have to avoid concentrated exposure to pulmonary irritants, as well as to extremes of heat, cold and humidity. (R. at 62.) The VE responded that there exists some sedentary, unskilled positions, such as order clerk, which was sedentary and unskilled. (R. at 62.) He added that there were about 8,080 such jobs in the Chicagoland area. (R. at 62.) He also mentioned the position of credit authorizer, which had 1,620 jobs

in the Chicagoland area. (R. at 62.) He also added charge account clerk, which he explained was basically interviewing someone for a charge account, and was sedentary and unskilled, and had 4,450 jobs in the Chicagoland area. (R. at 63.)

When asked if any of those jobs would allow a person to alternate sitting and standing, as needed, the VE testified that he believed so. (R. at 63.) When asked if any of the jobs he mentioned allowed a person to elevate their legs at hip level while seated, the VE testified that he didn't think that would be a problem. (R. at 64.) the VE was then asked if a person could sustain any of the jobs he mentioned if there were periods of time where such individual had severe fatigue or interference with concentration whereby they'd be off task 20 percent of the workday on average. (R. at 64.) The VE responded that he did not believe so, and that he did not believe there would be jobs at that level. (R. at 64.) The VE added that an average of two absences a month due to cardiac symptoms would most likely preclude an individual from being employable. (R. at 64.) He also added that employers vary on how they handle individuals that have to consistently leave work after a half a day, explaining that such a circumstance would limit an individual's employability. (R. at 65.)

**B. *Medical Evidence***

In addition to the testimony of Ms. McCoy, the ME, and the VE, the ALJ had before him an abundance of medical records.

**1. *Medical Records from Prior to Alleged Onset Date***

Ms. McCoy's disability paperwork indicates that she claims that she became unable to work because of her disabling condition on August 2, 2005. (R. at 139.) Ms. McCoy and her attorney submitted medical records from Sunderland Hospital in Las Vegas, NV, where Ms. McCoy was treated in 2004. (R. at 233-34.) Ms. McCoy was admitted to Sunderland Hospital in June of 2004 (R. at 234.), and was diagnosed with a chronic, unspecified gastric ulcer with hemorrhage, without mention of obstruction. (R. at 235.) She was also diagnosed as having hypertension, though it was unspecified as to whether it was benign or malignant. (R. at 235.) She was also diagnosed with a personal history of venous thrombosis, embolism, and disease of the white blood cells. (R. at 235.) The principal procedure which Ms. McCoy underwent was an esophagogastroduodenoscopy (EGD) with closed biopsy, as well as a transfusion of packed cells. (R. at 235.)

The emergency physician's report indicated that Ms. McCoy complained of a sharp pain in her lower back on the left side. (R. at 236.) Ms. McCoy indicated that the pain was an "11" on a scale of "1-10," though the pain was not exacerbated by any

12

movements, coughing, or sitting in an upright position.  (R. at
236.)  The report also indicated that Ms. McCoy cited tenderness
in her lower back on the left side, and it was the clinical
impression of the emergency physician that Ms. McCoy was
suffering from gastroenteritis.  (R. at 237.)  The emergency
nurse's report also indicated that Ms. McCoy's pain had started
the day she checked herself in, and that she was suffering from
diarrhea, chills (R. at 238.), and vomiting.  (R. at 239.)

Later physician's reports by Ms. McCoy's attending
physician, Dr. Tariq, indicated that Ms. McCoy had a medical
history significant for chronic headache, hypertension, and
history of deep venous thrombosis in her lower left extremity.
(R. at 245.)  Dr. Tariq reported that Ms. McCoy reported feeling
weak and tired.  (R. at 245.)  Furthermore, Dr. Tariq noted that,
while Ms. McCoy looked like she was in no acute distress, she
looked exhausted.  (R. at 245.)  A later report of Ms. McCoy's
EDG confirmed that she was suffering from a pyloric channel
ulcer.  (R. at 247.)  Ms. McCoy was discharged from Sunderland on
June 23, 2004, although she was supposed to be discharged the day
before.  (R. at 244.)  Her blood tests showed that her hemoglobin
was at 8.8, so she was put on hold for discharge and given two
units of packed red blood cells.  (R. at 244.)  On the 23rd, her
hemoglobin was at 11, and she was cleared for discharge.  (R. at

244.)

Ms. McCoy's medical reports also indicate injuries to her ankle (R. at 260-69), as well as sinus problems. (R. at 264-66).

## 2. *Disability Reports*

Ms. McCoy submitted several disability reports to supplement her history of physical impairments. Ms. McCoy's first report was filed in December 2006. In the December 2006 report, Ms. McCoy explained that her illnesses were, "hypertension, heart disease, lung problem, and blood clots." (R. at 166.) She also explained that she was unable to walk very far because she quickly became exhausted. (R. at 166.) She also stated that she stopped working because she "was getting too sick to work." (R. at 166.) Ms. McCoy also listed the doctors she had been seeing regarding her conditions, including Cardiovascular Consultants of Naperville, IL, explaining that they treated her heart problems. (R. at 168.)

Ms. McCoy filed her next disability report in May 2007. This report listed Dr. Sharon Cline as one of Ms. McCoy's physicians, and cited the reasons for Ms. McCoy's visits as "congestive heart failure, blood clot in heart." (R. at 185.) The treatments from Dr. Cline were listed as "regular outpatient care for cardiac impairments." (R. at 185.)

Ms. McCoy filed her third disability report in September

14

2007. This report also named Dr. Cline as Ms. McCoy's physician. (R. at 194.) Ms. McCoy listed her reasons for visiting Dr. Cline as "severe heart impairment—congestive heart failure and a blood clot in her heart." (R. at 194.) Ms. McCoy listed her treatment as "regular outpatient cardiac treatment—in office visits to monitor ejection fraction and progress of CHF." (R. at 194.)

Ms. McCoy also answered questions about her daily living. She said that weakness affected many of her daily activities, such as opening twist lids on jars or food packages, and carrying bags or groceries. (R. at 173.) She also explained that she needed support getting up from a chair or sofa, and that she could sit for short periods of time only; she represented that sitting for two hours or more caused cramps in her legs. (R. at 174.) She added that she needed to take rest periods during the day, and that she couldn't do anything she used to do because she gets exhausted very quickly. (R. at 175.)

### 3. *Medical Records After the Alleged Onset Date*

On September 2, 2005, Ms. McCoy saw Dr. Hansen at the University Medical Center of Southern Nevada. (R. at 270.) She complained of weakness and a constant headache since that morning, and said that she took Excedrin. (R. at 270.) Dr. Hansen's diagnosis was that she was suffering from hypertension. (R. at 272.) He advised her to follow a low salt diet, to return

for a blood pressure check the next week, and to take her medications as written. (R. at 270.)

On October 4, 2006, Ms. McCoy went to the emergency room at Edward Hospital and was seen by Dr. Ryan Snitowsky. (R. at 317.) Ms. McCoy complained of pain on her left side, as well as in her chest. (R. at 317.) She rated her pain as a 10 out of 10. (R. at 317.) Dr. Snitowsky noted that she appeared comfortable and in no apparent distress, although she did complain of pain on her left side and tenderness and palpitation along her left side. (R. at 317.) Ms. McCoy was given morphine for her pain, and Lopressor for her elevated blood pressure. (R. at 318.) Ms. McCoy underwent an EKG, which showed a normal sinus rhythm, with a possible left atrial enlargement, and an abnormal ECG. (R. at 320.) A lung scan showed no findings suspicious for pulmonary embolism (R. at 340.), though pulmonologist Dr. Malone considered pulmonary vascular disease as possible. (R. at 428.) Renal ultrasound showed normal appearance of both kidneys. (R. at 341.) A pelvic ultrasound showed uterine fibroids, as well as a 2.1cm cyst in the right ovary and free fluid in the cul-de-sac and adnexa regions. (R. at 342.) Ms. McCoy's hospital records indicated that her chest pain was most likely not cardiac in origin. (R. at 324.) Her discharge summary indicated that her diagnoses were abdominal pain, fibroid tumors, chest pain, which

was most likely gastroesophogeal reflux disease, hypertension, abnormal pulmonary function tests, and a history of deep venous thrombosis. (R. at 327.) She was advised to take Protonix every day, aspirin every day, Percocet every six hours, Toprol XL every day, and Prinivil twice a day. (R. at 327.)

Ms. McCoy returned to the emergency room on December 25, 2006, complaining of intermittent sharp shooting chest pains in the left side of her chest and axilla area, as well as intermittent right leg pain. (R. at 334.) She underwent a chest x-ray, which came back normal, and also had blood work obtained, which was also normal. (R. at 334.) She was diagnosed with noncardiac chest pain and hypertension, and advised to keep her activity light, follow up with her primary care physician and cardiologist, and given Vicodin for pain. (R. at 335.)

On October 18, 2006, Ms. McCoy saw Dr. Sharon Cline, a cardiologist and her treating physician for all heart-related problems. (R. at 275.) Dr. Cline's report indicates at the time, Ms. McCoy had been recently hospitalized for abdominal pain, which revealed cholelithosis, as well as an enlarged heart. (R. at 275.) Dr. Cline laid out a plan for Ms. McCoy's hypertension, which included an EKG and stress test. (R. at 275.)

On Novebmer 7, 2006, Ms. McCoy underwent an EKG stress test,

which came back normal. (R. at 280.) That same day, she underwent a two-dimensional echocardiogram, which showed that her ejection fraction was estimated at 20-25%. (R. at 282.) Dr. Cline noted in her report that there was mild concentric left ventricular hypertrophy, as well as mild mitral regurgitation and diastolic dysfunction. (R. at 283.) Dr. Cline also noted that a LV thrombus could not be excluded. (R. at 283.) On November 11, 2006, Ms. McCoy followed up with Dr. Cline. (R. at 276.) Dr. Cline noted that the echocardiogram showed an ejection fraction of 20-25% and there possibly was a LV thrombus. (R. at 276.) Based on the November echocardiograms, Dr. Cline diagnosed Ms. McCoy with chronic systolic heart failure, and benign essential hypertension. (R. at 408.)

On January 3, 2007, Ms. McCoy returned to Dr. Cline, claiming that she felt tired and had gone to the emergency room on December 25, 2006 with her left arm and leg tingling. (R. at 277.) Dr. Cline reported that Ms. McCoy's hypertension was controlled. (R. at 277.)

Ms. McCoy underwent a follow-up two-dimensional echocardiogram on April 12, 2007. (R. at 305.) Dr. Cline noted that there was an interval improvement in her LV ejection fraction to 45-50%. (R. at 305.) Dr. Cline also noted that there was a persistent LV thrombus in the apex, however, it was

much smaller when compared to the November 7, 2006 study. (R. at 305.) Dr. Cline also noted that there was mild concentric left ventricular hypertrophy, as well as mild mitral regurgitation. (R. at 305.)

Ms. McCoy underwent another follow-up two-dimensional echocardiogram on June 22, 2007. (R. at 307.) This test showed an improved ejection fraction that was between 45-50%. (R. at 307.) Dr. Cline indicated that this test showed no intracardiac thrombus. (R. at 307.)

On June 29, 2007, Dr. Cline filled out and submitted a residual functional capacity questionnaire based on her experience with Ms. McCoy. (R. at 409.) She diagnosed Ms. McCoy with congestive heart failure, class II, and indicated that, in her view, Ms. McCoy was capable of low-stress jobs. (R. at 409-410.) She also noted that Ms. McCoy's cardiac symptoms were severe enough to often interfere with attention and concentration. (R. at 411.) Dr. Cline noted that Ms. McCoy's prognosis was good, as her ejection fraction had improved. (R. at 411.) She also noted that Ms. McCoy could not walk more than a half a city block without pain because of her sciatica. (R. at 412.) Dr. Cline wrote that Ms. McCoy could sit at least six hours in a work day, with her legs elevated to the level of her hips half the time, but stand less than two hours in a work day.

19

(R. at 412.) Dr. Cline also noted that there should be no environmental restrictions on Ms. McCoy, and that she could frequently lift ten pounds or less, and occasionally lift twenty pounds. (R. at 413.)

Ms. McCoy saw Dr. Cline again on October 31, 2007 for hypertension and congestive heart failure, which Dr. Cline noted as a hypersensitive heart. (R. at 400.) Dr. Cline's report explained that Ms. McCoy's ejection fraction was improving, and that the thrombus had resolved. (R. at 400.) Dr. Cline also noted that Ms. McCoy would follow up with Dr. Hubbard if she had any inconvenience with her back pain. (R. at 400.)

On February 4, 2008, Ms. McCoy underwent another two-dimensional echocardiogram. (R. at 465.) The results showed that there was generalized hypokinesis, although the inferior wall appeared moderately hypokinetic compared to mild hypokinesis of the other segments of the myocardium. (R. at 465.) The ejection fraction was 40-45%. (R. at 465.) Dr. Cline also noted that when compared to the June 22, 2007 test, there appeared to be a mild reduction in the LV systolic function, especially in the parasternal long axis view. (R. at 466.)

On August 20, 2008, Ms. McCoy followed up with Dr. Cline. (R. at 460.) Ms. McCoy told Dr. Cline that she had gone back to work, but that she was exhausted. (R. at 460.) Ms. McCoy also

noted that she could not walk through the airport. (R. at 460.)
On January 16, 2009, Ms. McCoy underwent another two-dimensional
echocardiogram. (R. at 462.) The results of the test showed
that the left ventricular systolic function was at the lower
limits of normal, and the ejection fraction was at 50-55%. (R.
at 462.) Dr. Cline noted improvement since the February 2008
test in the left ventricular function, particularly resolution of
the previously seen inferior wall hypokinesis. (R. at 463.)

On March 27, 2007, Ms. McCoy presented to Dr. Ivanenko at
the Central DuPage Center for Sleep Health. (R. at 372.) Dr.
Ivanenko noted that Ms. McCoy was diagnosed with congestive heart
failure before that day and obstructive sleep apnea on
polysomnography on the same day. (R. at 372.) Ms. McCoy
underwent testing with CPAP, which was started at 4 cmH2O and
gradually titrated to the final most effective pressure of 12
cmH2O. (R. at 372.) Ms. McCoy had no documented respiratory
disturbance events, though she continued to have breakthrough
snoring, mainly due to air leaks. (R. at 372.) Dr. Ivanenko
diagnosed Ms. McCoy with obstructive sleep apnea 327.23, and
noted that the CPAP titration study was successful, showing that
the pressure of 12 cmH2O was the most effective in controlling
Ms. McCoy's apneas, hypopneas, snoring, and improving sleep
continuity. (R. at 373.) Dr. Ivanenko recommended that Ms.

McCoy should start using the nasal CPAP at home with a set pressure of 12 cmH20.  (R. at 373.)

On June 18, 2008, Ms. McCoy presented to Dr. Ivanenko for a follow-up.  (R. at 436.)  Dr. Ivanenko indicated that Ms. McCoy was doing well on CPAP.  (R. at 436.)  Dr. Ivanenko also noted that Ms. McCoy should continue using the CPAP for her sleep apnea, and that Ms. McCoy take one Temazepam 15 mg at bedtime. (R. at 437.)

The record also indicates that Ms. McCoy saw her primary care physician, Dr. Hubbard for back pain (R. at 445, 449.) and elbow pain (R. at 447.) in 2007-2008.  In addition, she saw Dr. David McElligot in 2006 with a cough and shortness of breath, consistent with asthma or restrictive airways (R. at 303.)

### The ALJ'S Decision

On April 27, 2009, the ALJ issued his decision, ruling that Ms. McCoy was not disabled under sections 216(i) and 223(d) of the Social Security Act.  (R. at 73, 80.)

Initially, the ALJ determined that Ms. McCoy's earnings record showed that she had acquired sufficient quarters of coverage to remain insured through December 31, 2010.  (R. at 76.)  Thus, to receive benefits, she needed to establish disability on or before that date.  (R. at 76.)

Applying the five-step sequential analysis spelled out in

the Social Security Regulations, the ALJ found that Ms. McCoy met the insured status requirements of the Social Security Act through December 31, 2010, and that she had not engaged in substantial gainful activity ("SGA") since August 2, 2005, the alleged onset date. (R. at 77.) The ALJ explained that the claimant returned to full-time work on November 10, 2008, and was still working at the time of the hearing. (R. at 77.) He explained that counsel argued for a finding of disabled since August 2, 2005, with a trial work period, or alternatively, a closed period ending on November 10, 2008. (R. at 77.) He concluded that, since the decision was unfavorable on other grounds, he did not need to address whether her work was disqualifying SGA. (R. at 77.)

He also found that Ms. McCoy had the following severe impairments: chronic obstructive pulmonary disease (COPD), obstructive sleep apnea, and a history of cardiomyopathy. (R. at 78.) He determined, however, that Ms. McCoy did not have an impairment or combination of impairments that meets or medically equals a Listing, as Ms. McCoy's pulmonary function test was normal, her sleep disorder was not too severe, and her heart problem was under good control. (R. at 78.)

The ALJ also ruled that Ms. McCoy had the residual functional capacity to perform light work as defined in 20 CFR

404.1567(b) and 416.967(b), except that, due to respiratory problems, she should not climb ladders, ropes, scaffolds, or have concentrated exposure to pulmonary irritants. (R. at 78.) He explained that he followed a two-step process, first determining whether there is an underlying medically determinable physical or mental impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce claimant's pain or other symptoms. (R. at 78.) Second, he must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. (R. at 78.) The ALJ found that Ms. McCoy's residual functional capacity was as the ME opined: limited to lifting 20 pounds, avoiding concentrated exposure to pulmonary irritants, and no climbing ropes, scaffolds, or ladders. (R. at 78.)

In assessing Ms. McCoy's RFC, the ALJ found that Ms. McCoy was not entirely credible. (R. at 78.) He noted that, while her medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment. (R. at 79.) He relied

on the objective medical and other probative and credible evidence that undercut Ms. McCoy's credibility; e.g. the ME's opinion evidence and RFC. (R. at 79.) He explained that Dr. Cline's opinion that the claimant cannot stand or walk even 2 hours in an 8-hour workday was not well-supported by medically acceptable diagnostic techniques and was inconsistent with the other substantial evidence of record; thus, Dr. Cline's opinion was not entitled to significant weight, despite her status as a "treating physician." (R. at 79.) The ALJ also explained that he considered the evidence of Ms. McCoy's daily activities, and considered her impairments in combination, noting for the record that no testimony was given by friends and/or relatives at the hearing. (R. at 79.) Using this RFC, the ALJ determined that Ms. McCoy was not capable of performing her past relevant work as a bank manager or loan underwriter. (R. at 79.)

At step five, the ALJ explained that Ms. McCoy was 49 years old at the time, which was defined as a younger individual, that she had a high school education, communicated in English, and had no job skills transferable to work at her current RFC level. (R. at 80.) He found that there were jobs that exist in significant numbers that she could perform. (R. at 80.) He noted that the VE testified to the existence of the following unskilled sedentary jobs in the regional economy: order clerk, 8,000 jobs,

call out operator, 1,620 jobs, and charge account clerk, 4,450

jobs. (R. at 80.) The ALJ noted that such jobs would exist in

these numbers, even with a sit/stand option or a requirement for

elevating the legs to hip level. (R. at 80.) He found that,

based on the VE's testimony, the claimant was capable of making a

successful adjustment to other work that existed in significant

numbers in the national economy. (R. at 80.) Because of this,

the ALJ concluded that Ms. McCoy had not been under a disability,

as defined in the Social Security act, from August 2, 2005,

through the date of his decision. (R. at 80.)

## Social Security Regulations

When an individual claims the need for DIB, she must prove

the existence of disability under the terms of the SSA. In

determining whether an individual is eligible for benefits, the

Social Security regulations require a sequential five-step

analysis. First, the ALJ must determine whether the claimant is

currently employed; second, a determination must be made as to

whether the claimant has a severe impairment; third, the ALJ must

determine whether the impairment meets or equals one of the

impairments listed by the Commissioner in 20 C.F.R. Part 404,

Subpart P, Appendix 1; fourth, the ALJ must determine the

claimant's residual functional capacity ("RFC"); and fifth, the

ALJ must decide whether the claimant is capable of performing

work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313
(7th Cir. 1995). At steps one through four, the claimant bears
the burden of proof; at step five, the burden shifts to the
Commissioner. *Id.*

## Standard Of Review

A district court reviewing an ALJ's decision must affirm if
the decision is supported by substantial evidence and is free
from legal error. 42 U.S.C. § 505(g); *Steele v. Barnhart*, 290
F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more
than a mere scintilla"; rather, it is "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).
In reviewing an ALJ's decision for substantial evidence, the
Court may not "displace the ALJ's judgment by reconsidering facts
or evidence or making credibility determinations." *Skinner v.
Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v.
Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting
evidence allows reasonable minds to differ, the responsibility
for determining whether a claimant is disabled falls upon the
Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178,
181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate
and logical bridge from the evidence to his conclusions, so that

27

the Court may afford the claimant meaningful review of the SSA's findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision: if the ALJ does not rationally articulate the grounds of that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

## Discussion

Ms. McCoy raises three issues before this Court. First, she argues that the ALJ's RFC assessment was not supported by substantial evidence because he improperly weighed the medical opinions and also improperly rejected the plaintiff's nonexertional limitations. Second, Ms. McCoy argues that the ALJ's credibility findings were erroneous and not supported by the evidence. Third, in a separate brief, she argues that the ALJ's hypothetical to the VE, with a limitation to "unskilled" work, was insufficient to describe and accommodate Ms. McCoy's concentration deficiencies and "often" limitations. The Court rejects all three arguments.

### A. *Weight of the Medical Opinions*

Ms. McCoy argues that the ALJ failed to evaluate her "nonexertional" limitations, such as fatigue, and failed to explain why her fatigue would not impact her ability to sustain full-time work on a continuous basis. A decision denying

benefits need not discuss every piece of evidence, but if it lacks an adequate discussion of the issues, it will be remanded. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). The ALJ included several limitations in his hypothetical to the VE, though he did not specifically include a limitation relating to fatigue or tiredness. As the Court explains more fully below, the ALJ declined to do so because he did not find her testimony on this issue to be credible. The Court finds nothing improper in that decision.

Ms. McCoy next argues that the ALJ erred by failing to properly weigh the medical opinions pursuant to the criteria spelled out in the regulations. If the opinion of a treating physician is supported by acceptable medical evidence and is not inconsistent with other substantial evidence in the record, it must be given controlling weight. 20 C.F.R. § 404.1527(d)(2); *e.g.*, *Boiles v. Barnhart*, 395 F.3d 421, 426(7th Cir. 2005). However, a treating physician's opinion is not entitled to such weight where the record evidence contradicts that opinion. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)). Furthermore, although the regulations lay out certain factors to be applied when considering the weight to be given to a treating physician's opinion, the ALJ's consideration of regulatory

factors need not be explicit; the ALJ need only "minimally articulate" his reasons for discounting a treating physician's opinion, a standard described as "very deferential" and "lax." *Allen v. Astrue*, 721 F. Supp. 2d 769, 781 (N.D. Ill. 2010).

In the case at hand, Dr. Cline opined that Ms. McCoy could not stand or walk even 2 hours in an 8-hour work day; the ALJ discounted this opinion because it was not well-supported by medically acceptable diagnostic techniques and was inconsistent with the other evidence of record; thus, the ALJ determined, Dr. Cline's opinion was not entitled to significant weight, simply because she was a treating physician. (R. at 79.) And, to be sure, there is a lot of evidence in the record that contradicts Dr. Cline's opinion.

The ME testified at Ms. McCoy's hearing before the ALJ that he saw no reason why Ms. McCoy could not perform light work with some environmental restrictions; specifically, the ME noted that Ms. McCoy's most recent echocardiogram showed that her ejection fraction was improving; that her lung disease was very mild; and that her sleep apnea was controlled and did not appear to be a problem at the time. (R. at 33-34). This testimony is supported in the record. In terms of Ms. McCoy's sleep apnea, Dr. Ivanenko indicated that Ms. McCoy was doing well with her CPAP therapy. (R. at 436.)

30

Perhaps most importantly, with respect to Dr. Cline's opinion, Dr. Cline's own notes contradict her opinion that Ms. McCoy could not stand or walk 2 hours in an 8-hour work day. Dr. Cline indicated that Ms. McCoy's prognosis was good (R. at 411.), and her ejection fraction had improved to 50-55%. (R. at 462.) Dr. Cline also noted that Ms. McCoy could sit at least six hours in a work day, with her legs elevated to the level of her hips, and that she required no environmental restrictions. (R. at 412-3.) Dr. Cline also explained that Ms. McCoy could frequently lift ten pounds or less, and occasionally lift twenty pounds, needed no environmental or respiratory restrictions. (R. at 413.) Dr. Cline determined that there were no other limitations that would affect Ms. McCoy's ability to work at a regular job on a sustained basis, and that Ms. McCoy was capable of working low-stress jobs. (R. at 410, 414.) All of this evidence contradicts Dr. Cline's conclusory opinion that Ms. McCoy could not walk or stand 2 hours in an 8-hour workday.

Not only that, but the ALJ ultimately limited Ms. McCoy to unskilled sedentary jobs, which would presumably be consistent with even Dr. Cline's opinion concerning her limited ability to walk and stand.

Because there was evidence in the record contradicting Dr. Cline's opinion, including other opinions of Dr. Cline herself,

the ALJ was justified in not giving Dr. Cline the preferential treatment of the "treating physician." As far as the standard in *Allen* is concerned, the ALJ did more than minimally articulate his reasons for discounting Dr. Cline's opinion by stating that it was inconsistent with the record evidence. The ALJ satisfied the deferential standard laid out in *Allen*.

Relatedly, Ms. McCoy argues that the ALJ ignored, without discussion, the portion of the ME's testimony that was contrary to the ALJ's finding at Step Five, and that the ALJ failed to build a logical bridge between the evidence and conclusion for doing so. But, based upon the ALJ's evaluation of the evidence and his determinations concerning what evidence and opinions deserved controlling weight and what evidence and opinions should be discredited, the Court finds that he built an accurate and logical bridge.

## B. Credibility Finding

Ms. McCoy next argues that the ALJ's credibility finding is erroneous and not supported by substantial evidence. An ALJ's credibility determination is reviewed with deference. *Allen v. Astrue*, 721 F. Supp. 2d 769, 782 (N.D. Ill. 2010) (citing *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)). An ALJ is required to carefully evaluate all evidence bearing on the severity of pain and give specific reasons for discounting a

claimant's testimony about it. *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). When assessing the claimant's credibility, the ALJ need not rely on the claimant's subjective complaints where those complaints are not supported by the objective evidence. *Allen*, 721 F. Supp 2d at 782 (citing *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). A boilerplate credibility assessment will not, however, pass muster, that is not what happened here. *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011).

Ms. McCoy's primary argument here is that the ALJ improperly discounted her subjective testimony regarding her fatigue. But the ALJ's decision to discount her complaints was supported in the record. Ms. McCoy testified that she was tired and that her fatigue would prevent her from doing anything, including working. But there appears to be no objective evidence to support her complaints; on the contrary, the evidence undermines her complaints. To the extent she is claiming fatigue caused by her cardiovascular problems, her complaints are substantially undermined by the evidence showing that her ejection fraction had improved to 50-55%, and by her cardiologist, Dr. Cline, who indicated that her prognosis was good. (R. at 411, 462.) To the extent she is claiming fatigue caused by sleep apnea, her complaints are substantially undermined by the evidence showing

that CPAP therapy was working to alleviate that problem. (R. at 436.) And, to the extent she is claiming fatigue caused by her inability to sleep for reasons unrelated to the apnea, her complaints are substantially undermined by her testimony that she was given a prescription for sleeping pills, but chose not to take them. (R. at 57.)[1]

Ms. McCoy also argues that the Commissioner may not discredit her testimony as to subjective symptoms merely because the severity and extent of the symptoms are unsupported by objective evidence. But, again, that is not what happened here. Not only did the objective evidence not support her complaints, but it undermined them sustantially.

In his opinion, the ALJ found that Ms. McCoy's testimony was not credible because her statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent with her residual functional capacity assessment. (R. at 79.) The ALJ did find that Ms. McCoy's medically determinable impairments could reasonably be expected to cause

---

[1] The record shows that Ms. McCoy reported experiencing surprisingly high pain levels with back problems (R. at 236.), an ankle injury (R. at 260.), and sciatica. (R. at 412.) For example, she reported pain associated with a back injury as an "11" on a scale of 1 to 10 (R. at 236.), and she reported pain associated with a sprained ankle as a "10" on a scale of 1 to 10. (R. at 262.) However, she is not claiming disability based upon either condition.

the alleged symptoms.  The ALJ also noted that he considered Ms. McCoy's impairments in combination, "e.g. lung, sleeping problems, and heart problems, and the impact on claimant's pain and other symptoms."  (R. at 79.)  The ALJ then noted that he exhaustively reviewed all of the relevant medical and other evidence, including Ms. McCoy's recent 2009 echocardiogram that showed her ejection fraction on the low end of normal at 50-55% and an improvement from the prior echocardiogram in 2008.  (R. at 79.)  The ALJ explained that he considered the evidence of Ms. McCoy's daily activities, including full-time work since November 2008, through at least the date of the hearing (1/27/09).  (R. at 79.)  The ALJ further noted that he considered in his RFC the fact that Ms. McCoy was limited to sedentary, unskilled jobs, and that the VE testified that she would be able to perform the requirements of such jobs in the regional economy.  (R. at 80.)

## C. *The ALJ's Hypothetical*

Finally, Ms. McCoy argues that the ALJ's hypothetical to the VE, with a limitation to "unskilled" work, was insufficient to describe and accommodate Ms. McCoy's concentration deficiencies and "often" limitations.  Courts have assumed a VE's familiarity with a claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly

addressing those limitations. *O'Connor-Spinner v. Astrue*, 627
F.3d 614, 619 (7th Cir. 2010). Here, the record shows that the
VE was familiar with Ms. McCoy's work history. (R. at 61.)
While the ALJ never specifically asked the VE any questions
pertaining to Ms. McCoy's medical history, the VE was present
when both the ME and Ms. McCoy testified concerning her medical
history and limitations. (R. at 24.) Therefore, the Court finds
that the hypothetical posed to the VE was sufficient based on the
record as a whole.

### CONCLUSION

For the reasons set forth above, the Court denies Ms.
McCoy's Motion for Summary Judgment, and grants the
Commissioner's Motion for Summary Judgment.


Dated: July 29, 2011


ENTER:


ARLANDER KEYS
United States Magistrate Judge